UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| NICHOLAS P. LABER,<br><br>Plaintiff,<br><br>vs.<br><br>KILOLO KIJAKAZI,[1] Acting Commissioner of the Social Security Administration,<br><br>Defendant. | 5:20-CV-05051-KES<br><br><br>ORDER REVERSING COMMISSIONER'S DECISION AND REMANDING FOR RECONSIDERATION |

Plaintiff, Nicholas P. Laber, seeks review of the decision of the Commissioner of the Social Security Administration denying his claim for disability benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 423 & 1382. *See* Docket 1. The Commissioner opposes the motion and urges the court to affirm the denial of benefits. Docket 23. For the following reasons, the court reverses the decision of the Commissioner and remands for further consideration.

---

[1] Kilolo Kijakazi, the current Acting Commissioner of Social Security, is substituted for defendant Andrew Saul pursuant to Federal Rule of Civil Procedure 25(d). *See* Docket 23 at 1 n.1.

**FACTS**

I.   **Procedural Background**

Laber filed an application for Title II and Title XVI benefits on August 24, 2017, alleging disability beginning September 22, 2016. AR 12. The Commissioner denied his application initially on November 14, 2017, and upon reconsideration on March 7, 2018. AR 12. Laber requested a hearing, which was held via video before Administrative Law Judge (ALJ) Lyle Olson on October 4, 2019. AR 12. On December 19, 2019, the ALJ issued an opinion affirming the denial of benefits. AR 28. The Appeals Council then denied Laber's request for review. AR 1. Thus, Laber's appeal of the Commissioner's final decision is properly before the court pursuant to 42 U.S.C. § 405(g).

II.  **Laber's Medical and Occupational History**

Laber, now 34 years old, has hypothyroidism, iatrogenic pituitary disorder, and testicular hypofunction. AR 554. He also has bipolar, mood, and anxiety disorders. AR 16, 37. These conditions are all of adolescent onset. AR 36. Laber lives in a mobile home with his son,[2] who was fourteen years old at the time of the hearing. AR 63-64. At times, Laber has also had a girlfriend living with him. AR 64. Laber's mother and grandmother make the payments on his mobile home, and his mother functions like his "case manager." AR 64, 623.

---

[2] The ALJ opinion refers to Laber's child as his daughter. AR 17. This appears to be an error, as Laber has only one child, who is otherwise referenced to as his son throughout the record. *See, e.g.*, AR 63, 79.

2

In July 2009, Dr. Charles Lord, a psychiatrist, began treating Laber, and has continued to do so since then. AR 403-449, 596-693. Throughout his visits with Dr. Lord, Laber has self-reported sleep issues, difficulty with concentration and focus, agitation, difficulty controlling his emotions, angry impulses, and feeling overwhelmed. *E.g.*, AR 410, 597, 620. Dr. Lord's own observations of Laber during these visits include that he had anxiety, paranoia during times of distress, and issues with cognition, memory, concentration, and judgement. *See, e.g.*, AR 406-07, 417, 420, 598, 602, 624. The treatment records as a whole reflect that Laber's disorders combine to create a "fluid illness," with some "cool[ing] off" periods, and other periods characterized by "meltdowns" and levels of agitation where Dr. Lord considered hospitalizing him. AR 413, 480, 487. Despite these difficulties, Dr. Lord noted during many of the visits that Laber was "reasonably alert, cooperative, coherent, and oriented" and that he remained cognitively on task during a structured interview. *See, e.g.*, AR 429, 623.

Laber has tried various medications over the years to treat his mental health disorders, though some he chose to discontinue due to negative side effects. *See e.g.*, AR 599. Although he struggled in the past to take his medications consistently, it appears he is largely now able to do so, which Dr. Lord credits to his mother's assistance. AR 620, 623. Laber has largely been able to keep his appointments with Dr. Lord, although occasionally he fails to show up or cancels at the last minute. *See, e.g.*, 606-609, 683, 689. Laber's inability to stay employed long-term has been a frequent concern during his

sessions with Dr. Lord, and as early as August 2012, Dr. Lord noted that Laber needed sheltered employment because of his health issues and that "Laber was ill to the point of being on disability." AR 622.

Laber dropped out of high school in his junior year, later earning a high school diploma through an alternative school. AR 410-11. He has attended college off-and-on, but has not yet earned a degree. AR 64-65. Since the onset of his conditions, his work history largely consists of food service, construction, and landscaping jobs that last only a few weeks or months before he is terminated or resigns. AR 79, 369-72. The one job that lasted longer was his job at Knecht Home Center, where he worked from approximately mid-2014 up to the alleged disability onset date in October 2016. AR 15, 371, 655. Dr. Lord attributes this to starting a new medication at that time, his mother's support, and to him being "somewhat sheltered" by an understanding supervisor at Knecht. AR 38, 661. Laber quit his job at Knecht due to "stress at the worksite" and because he "just couldn't handle it anymore." AR 441.

After Laber left his job at Knecht, he had several more short-term jobs, but he has not worked at all since the fall of 2018. AR 14-16. Laber testified that he often was not informed of the reasons he was terminated from these jobs, but that generally he was fired or resigned because he "just couldn't handle it . . . couldn't do what they wanted [him] to do . . . couldn't meet their expectations." AR 66, 68, 79. He also testified that at times he will get so anxious and nervous that he could not show up for work. AR 76.

### III. Laber's Activities and Capacities

At the hearing, Laber testified that he bathes without assistance, does household chores, cooks for him and his son, goes grocery shopping, and does yard work, though he said that he is often quite fatigued and needs to take frequent breaks between tasks. AR 81-82. Laber is responsible for waking his son up for school and getting him to school. AR 81. He also testified that he can do simple math, write, and read, though he is a slower reader than most. AR 65. He also said that he is "pretty good" at managing his money. AR 65. Laber stated that he rarely watches television or plays computer or video games, occasionally plays card or puzzle games, and sometimes goes to friend's houses. AR 80-81. Laber also submitted a Function Report, which aligns with and expands on the activities and capacities he testified about at the hearing. AR 291-304.

Laber's mother, Kim, also testified at the hearing. She said that "[o]n a daily basis," she assists her son with paperwork, reminds him of things he needs to do, and calls him to ensure he is awake to get his son to school. AR 85. According to Kim, Laber is only functional three to four hours per day. AR 86. She also testified that Laber is "not good with other people in a group setting," and that "[i]f something comes up along the way that upsets the apple cart, he's just done that day." AR 86-87. She further testified that when he is at work, he cannot remember what other people tell him to do. AR 87. Regarding Laber's son, Kim testified that "[h]e knows sometimes he has to look out for his

5

dad because his dad sometimes will get taken advantage of by other people and get himself in a bad situation." AR 89.

## THE FIVE STEP PROCEDURE FOR DISABILITY DETERMINATION

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416, 423(d)(1)(A); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled, and the inquiry ends at this step.
>
> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are severe, i.e., whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled, and the inquiry ends at this step.
>
> **Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. If the

6

applicant's impairment(s) are severe but do not meet or equal a Listed impairment, the ALJ must proceed to step four.

**Step Four:** Determine whether the applicant can perform past relevant work. To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, even those that are not severe, to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(f).

Here, the ALJ found at Step One that Laber has not been engaged in substantial gainful activity since the alleged disability onset date. AR 15. At Step Two, the ALJ found that Laber has the following severe impairments and severe medically determinable mental impairments: iatronic pituitary disorder, testicular hypofunction, hypothyroidism, mood disorder, and anxiety disorder. AR 16. At Step Three, the ALJ determined that Laber does not have an impairment or combination of impairments that meets the criteria of one of the Listings in 20 CFR Part 404, Subpart P, Appendix 1. For Step Four, the ALJ determined that, based on Laber's RFC, he was not able to perform any past relevant work, but at Step Five, found that there are jobs that exist in the national economy that Laber can perform. AR 26-27.

## DISCUSSION

### I. Standard of Review

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings

7

of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted). The court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## II.     The ALJ's Consideration of Dr. Lord's Opinion

Laber argues that the ALJ did not properly consider Dr. Lord's opinion that Laber had either marked or extreme limitations in various domains of mental functioning related to Laber's ability to "understand, remember, and carry out instructions," and his ability to "interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting." AR 694-95; Docket 22 at 29-32; Docket 24 at 1-4. Dr. Lord offered this opinion in a Medical Source Statement, which is a form prepared by the Social Security Administration. AR 694-96. Dr. Lord checked the provided boxes to indicate the severity Laber's limitations, and he provided short explanations for these opinions in the limited space provided on the form. AR 694-96. Dr. Lord expanded on his opinion in the Medical Source Statement in a separate letter. AR 36-38. Although the letter was submitted after the written decision from the ALJ, the Appeals Council considered the letter in denying Laber's request for reconsideration. AR 2. Thus, this court will include the letter in deciding whether the ALJ's determination is supported by substantial evidence on the record as a whole. *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994). This means that the court "must speculate to some extent on how the [ALJ] would have weighed [the letter] if [it] had been available for the original hearing." *Id.*

Because Laber applied for disability after March 27, 2017, the ALJ's consideration of medical opinions is governed by 20 C.F.R. § 404.1520c. The regulations were revised to "provide individuals with a better understanding of

9

[the ALJ's] determinations and decisions." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5854 (Jan. 18, 2017). Under the previous regulation, medical opinions from treating providers were given "controlling weight," as long as those opinions were "well-supported" and "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). Under the newer standards, an ALJ is not to "defer or give any specific evidentiary weight" to any medical opinion, including those of treating providers. 20 C.F.R. § 404.1520c(a). The new regulation, however, still recognizes the "foundational nature" of the opinions of treating providers. *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018); 20 C.F.R. § 404.1520c(3)(v) ("A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.").

Under the new regulation, the ALJ must consider each of following factors, with the first two factors being the most important: supportability, consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 404.1520c(b)-(c). An ALJ must explain how the supportability and consistency factors were considered for a medical opinion but is generally not required to explain how the other factors were considered. 20 C.F.R. § 404.1520c(b)(2). The ALJ found Dr. Lord's opinion that Laber had either marked or extreme limitations in work-related areas of mental functioning to

10

be "unpersuasive" because it was not supported by objective medical evidence and because it was inconsistent with Laber's activities of daily living. AR 25.

### A. Supportability of Dr. Lord's Opinion

The "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support" the medical opinion, the more persuasive it will be. 20 C.F.R. 404.1520c(c)(1). Medical opinions are of "little evidentiary value" when they "consist of nothing more than vague, conclusory statements," such as "checked boxes, circled answers, and brief fill-in-the-blank responses." *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018). But "even when a checkbox or conclusory medical source opinion does not provide extensive explanations, the ALJ is required to view the medical source opinion in the context of the claimant's medical record." *John B.H. v. Saul*, 2021 WL 1192930, at *26 (D.S.D. Mar. 20, 2021) (citing *Despain v. Berryhill*, 926 F.3d 1024, 1028 (8th Cir. 2019)).

The ALJ found that Dr. Lord's opinion lacked supportability because of Dr. Lord's own "objective observation[s]" that Laber had a "reasonably intact mental status" and because findings from Dr. Lord's "objective mental status exam . . . were fairly benign and consistent with a finding of reasonably good and stable condition[.]" AR 22-23, 25. The basis for this conclusion appears to be that in notes from many of Laber's visits, Dr. Lord observed that Laber was "alert, cooperative, coherent, and oriented" and "on task during the interview," including during the appointments immediately before and immediately after the alleged disability onset date. AR 22-23; *see also* AR 442, 692.

11

But the ALJ does not explain how these statements about Laber's ability to be coherent and on task during structured interviews, which typically lasted only 15-25 minutes, undermine Dr. Lord's opinion about Laber's limitations in understanding and carrying out instructions, exercising judgment in the workplace, and interacting with others in a work setting. *See Flatqual v. Saul*, 2019 WL 4857584, at *25 (D.S.D. Oct. 2, 2019) (ALJ improperly discounted medical opinion because ALJ failed to explain how doctor's finding of "normal strength and neurological readings" undermined doctor's opinion about claimant's sitting and standing functionality); *see also Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("[D]oing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to [his] work-related functional capacity.") Similarly, the ALJ also relied on Dr. Lord's observations of no "psychomotor agitation," Laber's "intact ability to do simple calculations," and Laber's "expressed understanding of treatment protocol" to conclude that Laber "retained reasonabl[e] psychological stability into the alleged period of disability," but he does not explain how these observations undermine Dr. Lord's opinions about Laber's mental functioning. AR 22-23.

These same treatment notes are replete with observations from Dr. Lord that directly support his conclusions about Laber's limitations in the specified areas of work-related mental functioning. For example, in the notes from Laber's last visit before the alleged onset period, Dr. Lord noted that Laber "appears to be moving away from the job he has had," that he "has been more suspicious lately and even at times accusatory of those around him," and that

he "remain[s] reactive, sensitive, and labile to environmental stress." AR 692. Notes from Laber's first visit during the alleged disability period, and his first after quitting his job at Knecht, include that Laber "continues to struggle and has significant problems with concentration, focus[,] and memory," in addition to him "bit[ing] off more than he can chew," and at times being "grandiose . . . arrogant, irribable[,] and . . . extremely distrustful." AR 441-42. These observations of Laber's focus and concentration limitations and his high reactivity to environmental stressors appear in notes from nearly every visit, and are much more relevant for evaluating the specific opinions given by Dr. Lord in his Medical Source Statement. Although the ALJ acknowledges these other observations, he provides no reasoning for privileging one set of findings over the other. *See Lutz v. Kijakazi*, 2022 WL 782300, at *5 (E.D. Mo. Mar. 15, 2022) (agreeing with claimant "that the absence of any explanation of why the ALJ disregarded [doctor's] limitation to one-to-two step tasks, when she accepted all of the other limitations in [the doctor's] opinion, requires remand").

Additionally, contrary to the ALJ's finding that Laber "remained stable" through 2019, Dr. Lord observed in March 2017 that Laber's mood stabilizer was insufficient and that he was "extremely mood labile at this juncture, tearfully[] sobbing and feeling emotional pain and out of control." AR 23, 436. The next month, Dr. Lord observed that Laber's "[m]emory, concentration, and focus are severely affected," but that he could not be prescribed a stimulant to address those issues as it would "make him more irritable and reactive." AR 433. In August of 2017, Dr. Lord noted that Laber's GAF had declined, from a

13

previous range of 50-55, to 48-50.[3] *See* AR 407, 692. In May 2018, Laber's level of agitation was so elevated that Dr. Lord was "significantly concerned about potentially having to hospitalize him to stabilize his condition." AR 487. Between December 2018 and February 2019, Laber missed four consecutive appointments with Dr. Lord. AR 473-76. In March 2019, Dr. Lord observed that Laber still had "significant problems with concentration, focus, and memory," and that his "[j]udgment, insight, [and] impulse control" remained impaired by his illness. AR 471. His GAF remained at 48-50 at this time. AR 470.

Although the ALJ did not have the benefit of Dr. Laber's letter before issuing the decision, this letter provides additional objective medical evidence to support his opinion regarding Laber's mental functioning limitations contained in the Medical Source Statement. Dr. Lord wrote that, due to his

---

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational, and psychological functioning" in the context of mental illness. *Nowling v. Colvin*, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016) (quoting *Pate-Fires*, 564 F.3d at 937-38 n.1-3). A GAF of 41-50 indicates that the person has "serious symptoms or any serious impairment in social, occupational, or school functioning." *Id.* (cleaned up). A GAF of 51 to 60 indicates that the person has "moderate symptoms or moderate difficulty in social, occupational, or social function." *Id.* (cleaned up). The Social Security Agency and the Eighth Circuit have recognized that GAF scores are of "limited importance." *Id.* Although the ALJ acknowledged that GAF scores were not dispositive, he also stated that Laber's GAF score of 50-55 just before the alleged onset of disability was "indicative of essentially moderate mental limitations" and "not consistent with a finding of disabling mental limitations in general." AR 22. The ALJ did not, however, note that Dr. Lord's estimation of Laber's GAF declined over time. *See Lutz*, 2022 WL 782300, at *5 ("[A]n ALJ is not required to discuss every piece of evidence submitted," but is also "not entitled to pick and choose only evidence in the record buttressing" their opinion. (internal citations and quotations omitted)).

14

disorders, Laber has "high reactivity to environmental stressors" and "a long history of oppositional defiant issues that can be called 'authority problems.' " AR 37. He noted that when Laber is "under distress, he often becomes avoidant or can 180 degrees from that and [be verbally] aggressive and threatening," and that "[h]is social anxiety is extremely high and he often will avoid going to work because of conflicts with people he works with." AR 37.

In this letter Dr. Lord also provided more context and explanation for the times during which it appears Laber's functioning is improved. He explained that Laber "can present reasonably well initially with kind of a passive thin veneer of having it together and within a short time or longer period of time he decompensates." AR 37. Dr. Lord situated Laber's employment at Knecht in this context, explaining that when Laber is "in a situation day in and day out and becomes more familiar with it, he can regress." AR 38. This happened during his employment at Knecht, where over time his mental functioning deteriorated to the point where he could not maintain that job, and he has continued to deteriorate since then, with his "mood variability, angry outbursts, and avoidance" causing him to lose the jobs he has attempted since leaving Knecht. AR 37. Given the objective medical evidence contained in the Medical Source Statement, the treatment notes, and Dr. Lord's letter, the court finds that the record does not provide substantial evidence for the ALJ's finding that Dr. Lord's opinion lacked supportability.

### B. Consistency of Dr. Lord's Opinion

The ALJ also found Dr. Lord's opinion unpersuasive because it was inconsistent with other evidence. "The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources[,]" the more persuasive it will be. 20 C.F.R. § 404.1520c(c)(2). The ALJ found Dr. Lord's opinion to be inconsistent with Laber's "acknowledged activities of daily living and capacities[.]" AR 25. But the ALJ failed to explain how Laber's acknowledged activities of daily living are inconsistent Dr. Lord's opinion regarding Laber's limitations in understanding and carrying out instructions, exercising judgment in the workplace, and interacting with others in a work setting. *See John B.H.*, 2021 WL 1192930, at \*27 (remanding in part because ALJ failed to specify how claimant's acknowledged activities were inconsistent with doctor's opinion).

The ALJ's discussion of Laber's activities and capacities is largely concerned with whether those are consistent with Laber's own statements about the severity and persistence of his symptoms, not with Dr. Lord's opinions about the specific mental functioning limitations listed on the Medical Source Statement. AR 24. For example, the ALJ notes that Laber's ability to "dress himself, take care of his personal needs, make a bed, cook meals, perform yard work, wash clothes, and shop for groceries," is inconsistent with "a disabling level of fatigue." AR 24. But Dr. Lord did not offer an opinion about Laber's level of fatigue, so it is not clear to the court how Dr. Lord's opinion is inconsistent with such activities. The ALJ's reasoning that most closely links

16

Dr. Lord's opinion and Laber's acknowledged activities is the ALJ's finding that Laber's acknowledged enjoyment of playing video games "goes to concentration, persistence, and pace[.]" When asked at the hearing whether he played video games, however, Laber responded only that he "[r]arely" does so. AR 80. This is too thin a reed to supply substantial evidence that Dr. Laber's opinion regarding Laber's mental functioning was inconsistent with other evidence.

### III.    The ALJ's Evaluation of Laber's Subjective Complaints

Laber next claims that the ALJ improperly "rejected Laber's testimony regarding his fatigue and his psychological difficulties, by finding that he could work in simple occupations as long as he did not have contact with the public." Docket 22 at 32. In evaluating subjective complaints, the ALJ "must give full consideration to all the evidence presented relating to subjective complaints," including from the claimant's work record and observations from third parties and medical professionals, regarding: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010) (applying *Polaski* framework to claimant's subjective complaints about mental health symptoms). "The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)). A claimant's credibility "is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).

17

Here, the ALJ partially credited and partially discounted Laber's own statements. The ALJ credited and incorporated into the RFC determination Laber's "alleged problems interacting with supervisors and co-workers," finding that Laber has the RFC to interact with co-workers and supervisors only "on a brief and superficial basis" and that he "should have no customer service contact with the public." AR 18, 24. The ALJ discounted Laber's subjective complaints to the extent that Laber expressed a "longitudinal inability to perform even simple tasks" or experienced a "disabling level of fatigue." AR 24. The ALJ provided several reasons for discounting these subjective complaints, including Laber's previous semi-skilled work at Knecht, his ability to care for his child as a single parent, and his intact ability to read, write, do simple math, and manage personal finances. AR 24. The ALJ also relied on Laber's activities of daily living, including his ability to "dress himself, take care of his personal needs, make a bed, cook meals, perform yard work, wash dishes, wash clothes, and shop for groceries," and his ability to drive. AR 24. A claimant's engagement in such "extensive" daily activities is a valid reason for rejecting a claimant's subjective claims. *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (affirming ALJ's rejection of claimant's subjective complaints where she "took care of her eleven-year-old child, drove her to school and did other driving, fixed simple meals for them, did housework, shopped for groceries and had no difficulty handling money"). Thus, the court finds that there was substantial evidence in the record for the ALJ to discount these subjective claims.

### IV.     Type of Remand

Laber requests that the court reverse the ALJ's decision and remand for a calculation of benefits. Docket 24 at 4. Because of the court's "abundant deference to the ALJ," a remand with instructions to award benefits is only appropriate where "the record overwhelming supports such a finding." *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (first quoting *Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998), then quoting *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992)). Otherwise, the court should remand for further administrative findings. *Id.*

Laber relies on *Cumella v. Cubin*, 936 F. Supp. 2d 1120 (D.S.D. 2013), to argue that remanding with instructions to award benefits is appropriate here. Docket 22 at 34. In *Cumella*, the vocational expert testified that if the claimant had the limitations reported by one of his doctors, then the claimant could not perform any jobs. 936 F. Supp. 2d at 1140. Likewise, the vocational expert at Laber's hearing testified that an individual with the marked limitations noted by Dr. Laber in the Medical Source Statement would not be competitively employable. AR 94-95. But *Cumella* was governed by the previous regulations for considering medical opinions, where the opinions of treating providers generally had controlling weight. Thus, once the court found that the doctor's opinion was controlling, there was nothing left to resolve. *See Cumella*, 936 F. Supp. 2d at 1140. That is not the case here, where the court has determined only that the ALJ did not properly evaluate or explain the supportability and consistency of Dr. Lord's opinion. *See John B.H.*, 2021 WL 1192930, at *38 (reversing and remanding for further administrative proceedings "because the record evidence should be clarified and properly evaluated").

19

## CONCLUSION

Because the ALJ did not properly evaluate or explain the supportability and consistency of Dr. Lord's opinion, it is

ORDERED that the Commissioner's decision is reversed and remanded for reconsideration in accordance with this order.

DATED March 25, 2022

                              BY THE COURT:

                              /s/ *Karen E. Schreier*
                              KAREN E. SCHREIER
                              UNITED STATES DISTRICT JUDGE